**United States District Court**
**Southern District of New York**
────────────────────────────

ROLANDO BOBADILLA,
                          **Plaintiff,**              03 Civ. 9217

          - against -                                 OPINION AND ORDER

MDRC,
                          **Defendant.**
────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiff, Rolando Bobadilla ("Bobadilla"), alleges that

his former employer, the defendant, Manpower Demonstration

Research Corporation ("MDRC"), violated the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. §§ 201-19, by failing to pay Bobadilla

time-and-a-half for hours worked in a given week in excess of

forty hours. The defendant, MDRC, moves for summary judgment.

MDRC argues that the plaintiff qualifies as a computer services

employee pursuant to 29 U.S.C. § 213(a)(17) as well as a bona

fide administrative or professional employee pursuant to 29

U.S.C. § 213(a)(1) and is therefore exempt from the FLSA's

overtime requirements.

                              I.

The standard for granting summary judgment is well

established. Summary judgment may not be granted unless "the

pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

1

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

(citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). See also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases); Estevez-Yalcin v. Children's Village, 331 F. Supp. 2d 170, 171 (S.D.N.Y. 2004).

## II.

The evidence in the summary judgment record, construed in the light most favorable to the plaintiff as the nonmoving party, is as follows.

MDRC is a nonprofit, nonpartisan social policy research organization. (Def.'s Rule 56.1 Stmt. ¶ 1.)[1] It employs approximately

---

[1] Where the plaintiff does not dispute the assertion made by MDRC in its Rule 56.1 Statement, only the paragraph in MDRC's

165 employees, and all of these employees have access to the MDRC computer network. (Id. ¶ 4.)  MDRC's computer network infrastructure includes but is not limited to a wide area network ("WAN"); a New York local area network ("NY LAN"); and a California local area network ("CA LAN").  (Id. ¶ 6.)  MDRC networks are connected to numerous devices, including servers, switches, hubs, and databases.  (Id. ¶ 7.)  A server is an operating system, and some users at MDRC had several servers.  (Id. ¶ 8-9.)  At the time the plaintiff was employed by MDRC, the NY LAN included 26 servers connecting 210 devices, including computers, printers, and storage hardware and the CA LAN included 3 servers connecting 25 devices.  (Id. ¶¶ 12, 14.)

In or around March 2001, MDRC had an opening for a Network Administrator[2] and conducted a search for someone with significant experience in managing computer system networks. (Id. ¶ 41.)  Paul Feliu, the Director of Information Technology ("IT"), reviewed the plaintiff's resume and found that Bobadilla had credentials related to network management.  (Id. ¶¶ 16, 43.)

---

Rule 56.1 Statement is cited.  (See Pl.'s Rule 56.1 Stmt. n.1.)
[2] Bobadilla assumed the title of "Information Associate-III (grade 24)".  (Ex. 1 attached to Decl. of Randall D. Bartlett ("Bartlett Decl.") dated Feb. 8, 2005; Pl.'s Rule 56.1 Stmt ¶ 3.) Bobadilla testified that his informal title was "Network Administrator," which was a common title used within MDRC to refer to members of the networking team.  (See Dep. of Rolando Bobadilla ("Bobadilla Dep.") dated Aug. 20, 2004, attached as Ex. 1 to Ho Aff., at 95.)  Accordingly, Bobadilla is referred to as a Network Administrator throughout this Opinion and Order.

During an interview with the plaintiff, Feliu discussed the plaintiff's overall experience with hardware and software that was listed on the plaintiff's resume, with a focus on Cisco networking experience.  (Id. ¶¶ 44-5, 61.)  At that time, the plaintiff's resume included references to:

> Hardware: Cisco routers and switches, Cisco VPN modules; Cisco Pix firewalls, Compaq 1850 servers; HP DL380; HP DLT; Dell Poweredge Servers; 3COM wireless networking devices; HP LPR's DAT backup devices; Matrix UPS; network analyzers.

> Software: Cisco IOS; What's Up Gold; Cisco Works; MS Exchange; 2K; Arc-Serve 2K; Checkpoint-FWI; Citrix; RAID; Cisco TFTP; VNC; VMWare; Win 2K advanced Server-AD; DHCP; WINS; DNS; HS; RAS/Routing, Win 2K Professional; Novell Netware 4.11.

(See Ex. 1 attached to Aff. of Paul Feliu ("Feliu Aff.") sworn to Dec. 13, 2004, attached as Ex. A. to Aff. of John Ho ("Ho Aff.") sworn to Dec. 15, 2004, ¶ 22.)  The plaintiff also held a certificate issued by Cisco Systems ("Cisco"), a manufacturer of network hardware and software, which entitled him to designation as a Cisco Certified Network Associate ("CCNA").[3]  (Def.'s Rule

---

[3]  A description of the CCNA examination posted on the Cisco website indicates that:

> The exam will certify that the successful candidate has important knowledge and skills necessary to select, connect, configure, and troubleshoot the various CISCO networking devices.  The exam covers topics on Extending Switched Networks with VLANS, Determining IP Routes, Managing IP traffic with Access Lists, Establishing Point-to-Point connections, and Establishing Frame Relay Connections.

(Def.'s Rule 56.1 Stmt. ¶ 48.)

56.1 Stmt. ¶ 46.)  According to the Cisco website, the CCNA exam requires the "planning and designing" of various network devices, including a requirement that applicants "[d]esign a simple LAN using Cisco technology", "[d]esign an IP address scheme to meet design requirements", and "[d]evelop an access list to meet user specifications."  (Ex. 2 to Feliu Aff.)  The plaintiff acknowledges that he was required to study "quite a bit" to pass the test.  (Bobadilla Dep. at 37; Def.'s Rule 56.1 Stmt. ¶ 50.)[4]

Bobadilla claims that he never received any formal training in computer technology, except for a one-week course during his prior employment.  (Bobadilla Dep. at 37-39.)  He obtained a high school diploma and his resume lists attendance at Brooklyn College and the NYU School of Professional Studies.  (See Ex. 4 attached to Feliu Aff.; Decl. of Rolando Bobadilla ("Bobadilla Decl.") dated Feb. 8, 2005 attached to Bartlett Decl., ¶ 4.)

Network Administrators typically have seven or more years of experience with personal computers.  (Def.'s Rule 56.1 Stmt. ¶ 39.)  When the plaintiff was interviewed for the position at

---

[4]  The plaintiff has also earned Cisco's Certified Design Associate ("CCDA") designation.  (Def.'s Rule 56.1 Stmt ¶ 52.) According to Cisco, the CCDA certified professional "can design routed and switched network infrastructures involving LAN, WAN, and dial access services for businesses and organizations."  (Id. ¶ 53.)  The plaintiff notes, however, that he earned the CCDA credential after he left MDRC.  (Pl.'s Rule 56.1 Stmt. ¶ 52.)

MDRC, Bobadilla claims to have had four years of experience working on computers and networks. (Bobadilla Decl. ¶ 3.) His resume, however, indicates a far longer history of experience with computers. In 1993, Bobadilla started his own private computer consulting service. (See Ex. 4 attached to Feliu Aff.) The plaintiff was employed in 1995 as a lab technician at The New School, where he was promoted to lab manager and then to "technical support analyst" in which he "[m]aintained all associated LAN connectivity" and "[c]onfigured and implemented all client configurations" for the Computer Services Department. (See id.) Bobadilla then worked at Condé Nast as a technical support analyst and at NYU Medical Center as a computer analyst. In both positions, Bobadilla worked on computer networking issues. (See id.) Immediately prior to his work at MDRC, Bobadilla worked at Oneclip.com, a dot.com startup, where he allegedly "[d]esigned a bastion router for its connectivity infrastructure; [and] [d]esigned and implemented physical and logical network infrastructure changes; . . . [d]esigned the Windows 2000 AD, DNS, DHCP, and WINS environment to facilitate the introduction of Exchange 2000." (Id.) The plaintiff claims that, at the time he was hired by MDRC, he did not have experience as a programmer, systems analyst, or software

engineer (Bobadilla Decl. ¶ 7), but that he had experience maintaining and troubleshooting personal computers.  (Id. ¶ 8.)

During the plaintiff's initial MDRC interview Feliu, noted that the "network" position was salaried and would sometimes require the plaintiff to work more than eight hours per day, and that the position was not eligible for overtime.  (Feliu Aff. ¶ 29; Def.'s Rule 56.1 Stmt. ¶¶ 55-56; Bobadilla Dep. at 76.) Feliu told the plaintiff that MDRC expected Bobadilla to design and implement a network system in California.  (Def.'s Rule 56.1 Stmt. ¶ 57.)  The plaintiff told Feliu that he had experience related to designing and implementing network systems.  (Id. ¶ 58.)

Feliu and three Network Administrators, including Angelica Manigbas, subsequently met with the plaintiff.  (Def.'s Rule 56.1 Stmt. ¶ 62.)  The Network Administrators allegedly informed the plaintiff that MDRC was looking for a senior level Network Administrator to provide support and to monitor a California network that MDRC expected to build.  (Id. ¶ 63.)  The plaintiff claims that he was not told that he would be responsible for the build-out of the California network.  (Pl.'s Rule 56.1 Stmt. ¶ 63.)  The plaintiff discussed his experiences at Oneclip.com and noted that he held a Cisco certification for which he had attended a one-week class.  (Def.'s Rule 56.1 Stmt. ¶¶ 66-68,

8

69-71.)  The Network Administrators informed Feliu that they believed Bobadilla was a suitable candidate for the open Network Administrator position at MDRC.  (Id. ¶ 72.)  MDRC offered the position to the plaintiff, and he accepted the position with a salary of $70,000 per year and a $5,000 signing bonus.  (Id. ¶ 75.)  This was the highest salary grade for a Network Administrator.  (Id. ¶ 77.)  At the time, the average salary for a Network Administrator was approximately $75,600 per year. (Id. ¶ 78.)

When the plaintiff began his employment at MDRC on or about April 16, 2001, the Network Administration position was classified as an exempt position within MDRC.  In 1998, MDRC had hired Mercer Human Resources Consulting, Inc. ("Mercer") to assist MDRC in establishing a formal salary structure and compensation administration program for its employees.  (Id. ¶ 171.)  During its evaluation, Mercer concluded that Network Administrators are exempt employees under the FLSA.  (Id. ¶¶ 174-76.)

In contrast to the exempt Network Administrators, MDRC's IT Department also included Help Desk employees who are classified as non-exempt.  (Id. ¶¶ 15, 27.)  Help Desk employees are paid an hourly wage plus overtime for hours worked in excess of forty hours per week or as otherwise required by law.  (Id. ¶ 28.)  At

the time that the plaintiff began working at MDRC, the average hourly rate for Help Desk employees was $24 per hour or about $43,680 per year based on MDRC's standard workweek of 35 hours. (Id.)  At all relevant times, MDRC's Help Desk group consisted of three individuals who assisted other MDRC employees with basic computer problems, including those related to personal computers, Microsoft Word, Microsoft Excel, printers, email accounts, and laptops.  (Id. ¶¶ 18-19.)

The parties dispute whether Help Desk employees perform any tasks on the MDRC network.  MDRC asserts that Help Desk personnel typically assist users with basic computer problems. (Id. ¶ 21.)  According to MDRC, the only network-related functions that Help Desk personnel perform are limited to network account access.  Help Desk employees assign account numbers and provide users with access to certain parts of the network (id.), but allegedly do not work on network equipment, servers, infrastructure, or network maintenance.  (Id. ¶ 22.) Rather, MDRC alleges that Help Desk personnel are primarily responsible for the physical maintenance of personal computer equipment.  For example, Help Desk personnel might replace a broken keyboard.  (Id. ¶ 23.)  MDRC does not require applicants for Help Desk positions to possess specialized computer certifications or computer degrees.  (Id. ¶ 30.)  MDRC maintains

that Help Desk personnel are prohibited from working on some network devices, including: WAN or LAN network devices; servers; switches; routers; power conditioning equipment; network backup devices; the network infrastructure; and network maintenance. (Id. ¶ 25.) If the Help Desk is not qualified to assist a user with a problem or the problem is directly related to network devices or "connectivity," it is allegedly referred to the Network Administrators. (Id. ¶ 26.) In response, Bobadilla alleges that Help Desk personnel are responsible for some network-related duties, including tests of network software, DSL connections, and Cisco wireless radios, and that Help Desk personnel also replaced network cards and patches. (Pl.'s Rule 56.1 Stmt. ¶¶ 21-22.)

As a Network Administrator, Bobadilla's working hours were 12 p.m. to 8 p.m. (Bobadilla Decl. ¶ 17.) The plaintiff was generally the only Network Administrator on duty from 5 p.m. to 8 p.m. on Monday through Friday. (Def.'s Rule 56.1 Stmt. ¶ 88.) Network Administrators individually monitored the New York and California networks on a rotating schedule on the weekends. (Id. ¶ 89.) Bobadilla alleges that roughly sixty percent of his time was devoted to performing "help[ ]desk functions," meaning that he took calls from other MDRC employees who were having trouble with their computers. (Bobadilla Decl. ¶¶ 12-13;

Bobadilla Dep. at 92-93.)  According to the plaintiff, most of
these user problems related to connectivity issues with the
network (Bobadilla Decl. ¶ 14), and Bobadilla alleges that he
was typically able to solve such issues by shutting down the
computers and turning them back on.  (Id. ¶ 15.)  Bobadilla
estimates that the remaining forty percent of his time was spent
taking one-on-one calls from MDRC's California office resolving
the same types of issues that went through the Help Desk and
working with the rest of his team to provide network services,
which included tasks like monitoring servers and backing-up
files.  (Bobadilla Dep. at 94; Bobadilla Decl. ¶ 16.)  When the
MDRC Help Desk closed at 6 p.m., Bobadilla also performed Help
Desk duties between 6 p.m. and 8 p.m.  (Bobadilla Decl. ¶ 17.)

In the summer of 2001, MDRC sent Bobadilla to its
California office, where he assisted in the installation of a
network that would synchronize with MDRC's New York network.
(Id. ¶¶ 21-22.)  The plaintiff was the only employee from the IT
Department sent from New York for approximately one month to
work on the build-out of the California network.  (Def.'s Rule
56.1 Stmt. ¶ 112.)  MDRC had never built out a network before
the California project, and the plaintiff was hired, in part, to
help MDRC design and implement its new CA LAN.  (Id. ¶¶ 101-02.)
Prior to launching the California network, meetings were held in

New York to coordinate the project. The plaintiff was involved in those meetings, which lasted several weeks before actual work began in California. (Id. ¶ 104.) The plaintiff contends that he was not heavily involved in these meetings. (See Pl.'s Rule 56.1 Stmt. ¶ 104.) The plaintiff objects to MDRC's suggestions that he had prior experience building out and designing various infrastructure changes, and notes that he had come from a company that had only one router. (Pl.'s Rule 56.1 Stmt. ¶ 113.)

In California, the plaintiff configured machines so that they would operate in MDRC's West Coast office, which required the plaintiff to access the operating systems for each network switch and each firewall, and input new routing configurations into device operating systems. (Def.'s Rule 56.1 Stmt. ¶¶ 107-08.) To accomplish this task, the plaintiff was required to obtain new IP addresses and implement new routing configurations using these IP addresses. (Id. ¶ 108.) The plaintiff maintains that the programming or configuration that he performed was based on instructions that he was given. (Pl.'s Rule 56.1 Stmt. ¶¶ 107-08.) Bobadilla maintains that he set up the network by installing network components and running wires according to specifications. (Bobadilla Decl. ¶ 26.) To the extent that he configured any components, Bobadilla contends that such

13

configuration was accomplished only according to instructions from MDRC consultants. (Id. ¶¶ 27-28.) Bobadilla claims that he never wrote computer programs, engineered software, or engaged in systems analysis in California, which were all duties allegedly performed by outside consultants. (Id. ¶ 30.) According to the plaintiff, he relied on systems experts who were under contract with MDRC as well as manufacturers' support teams when there were network problems that the Network Group could not resolve. (Id. ¶ 31.) Manigbas, another Network Administrator, was also in California with the plaintiff for about two weeks. Manigbas allegedly worked on certain network connectivity issues while the plaintiff worked with the Cisco system and the power conditioning system. (Def.'s Rule 56.1 Stmt. ¶ 114.) Together, Bobadilla and Manigbas tested and modified hardware and software, and provided progress reports to Feliu. (Id. ¶ 116-17.) A task list provides a list of some of the tasks performed, which included: the installation and configuration of Cisco equipment; the creation of user accounts on various servers; the creation of procedures to conform the California computer servers with procedures in New York; and the installation and removal of certain software. (See Ex. 7 attached to Feliu Aff.)

The plaintiff's employment at MDRC ended on or about July 9, 2003 due to budgeting constraints. (Def.'s Rule 56.1 Stmt.¶ 151.) At the time, he was earning $79,869 per year. (Id. ¶ 153.) The plaintiff sent Jesus Amadeo, MDRC's Chief Financial Officer, an email dated August 4, 2003. Bobadilla requested to keep one of the two MDRC laptops he had at home until he located another job. The plaintiff explained that, "The reason for the two laptops was that I used one as a testbed for configurations and software and the other to do admin work from home." (Ex. 14 attached to Feliu Aff. ¶ 78.)

## II.

The FLSA requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week, 29 U.S.C. § 207(a)(1), but exempts employers from this requirement with respect to individuals employed in certain categories. To avoid paying Bobadilla overtime, MDRC must prove that the plaintiff falls within an exempt category. MDRC argues that Bobadilla was exempt as a computer services employee pursuant to 29 U.S.C. § 213(a)(17). MDRC also contends that Bobadilla meets the definition of an "administrative employee" as well as a "computer professional," which is a subclass of "professional" employees, under 29 U.S.C. § 213(a)(1).[5] See Martin v. Indiana

_____

[5] "In 1990, Congress [by Pub. L. No. 101-583, § 2, 104 Stat. 2871 (1990)] directed the Department of Labor ("DOL") to

15

Michigan Power Co., 381 F.3d 574, 578 (6th Cir. 2004). It is the employer's burden to demonstrate that the plaintiff falls within the claimed exemption, and the exemption is construed narrowly against the employer who seeks to assert it. See Bohn v. Park City Group, Inc., 94 F.3d 1457, 1461 (10th Cir. 1996) (citations omitted).

---

redraft the Section [2]13(a)(1) regulations to allow certain computer services personnel to qualify as exempt." William G. Whittaker, Computer Services Personnel: Overtime Pay Under the Fair Labor Standards Act, Cong. Research Serv., Order Code RL30537, at CRS-2 (updated Jan. 6, 2003). In response, the DOL published rules implementing the legislation that made a number of changes to 29 C.F.R. § 541, the regulation applying the Section 213(a)(1) exemption. See id. at CRS-8. In 1996, Congress revisited the issue and created a new statutory exemption, Section 213(a)(17). See Small Business Job Protection Act of 1996, Pub. L. No. 104-188, sec. 2105, § 213, 110 Stat. 1755 (codified at 29 U.S.C. § 213(a)(17)). "Congress, thus, by-passed entirely the subparagraph Section [2]13(a)(1) reference to 'executive, administrative, or professional.'" Whittaker, at CRS-9.

The parties agree that the exemption in Section 213(a)(17) broadened the coverage of computer services personnel from that included in the prior Section 213(a)(1) computer professional exemption and the 1991 DOL regulations in three significant ways. First, it dispensed with Section 213(a)(1)'s requirement that the computer professional exemption apply "only to highly-skilled employees who have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge." See id. at CRS-9 (quoting 29 C.F.R. § 541.303(c) (DOL regulation regarding computer professionals)). Second, it eliminated any reference to educational requirements. Third, it eliminated the requirement that the employee's work require the exercise of independent judgment and discretion. (See letter from Michael P. Collins dated Aug. 17, 2005 at 2; letter from Randall Bartlett dated Aug. 19, 2005.) "With the targeted workers positioned under Section ([2]13)(a)(17), there was no longer any need for the Wage and Hour Division to define 'bona fide' or 'professional.'" Whittaker, at CRS-10.

To establish that Bobadilla is a computer employee pursuant to Section 213(a)(17) and therefore not entitled to overtime, MDRC argues that the plaintiff performed a combination of the duties of a highly-skilled computer employee as set forth in Section 213(a)(17), which provides that:

> [A]ny employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is--
>
>> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
>>
>> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>>
>> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>>
>> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and
>
> who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.

29 U.S.C. § 213(a)(17).[6]

---

[6] In 2004, the Wage and Hour Division, Department of Labor, promulgated extensive amendments to 29 C.F.R. Part 541 to implement the exemptions under the FLSA. See 29 C.F.R. § 541.0 et seq.; see also **Jackson v. McKesson Health Solutions LLC**, No. Civ.A. 03-11177-DPW, 2004 WL 2453000, at *3 n.4 (D. Mass. Oct. 29, 2004). The events in this case arose before the amendments and the parties do not contend that those regulations should be applied to this case.

In this case, the plaintiff is a computer employee subject to exemption from the FLSA's overtime pay requirement. The evidence plainly establishes that Bobadilla was paid a salary of approximately $75,600 per year, a rate that is significantly higher than the approximately $24 per hour or about $43,680 per year paid to Help Desk personnel.[7] (Feliu Aff. ¶ 14.)

The plaintiff's primary duties included a combination of the duties covered in 29 U.S.C. § 213(a)(17). Although the plaintiff maintains that he spent most of his time performing Help Desk functions, Bobadilla was principally of value to MDRC because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee and he was paid in excess of $75,000 per year, substantially more than the approximately $43,000 typically paid to Help Desk personnel. The plaintiff had experience related to network management and held a valuable Cisco CCNA credential that would allow him to develop computer systems based on user specifications. Before he was hired by MDRC, the plaintiff's resume listed experience with designing and implementing networks. (See Ex. 1 attached to Feliu Aff.) The record also demonstrates that the plaintiff was expected to take on more complicated duties at MDRC than he had performed in the past, including work designing and implementing MDRC's California network, a complex project that involved the performance of exempt duties, including the configuration of the new network, and the testing and modification of hardware and software. After the California network was installed, the plaintiff was also involved in analyzing and testing the networks in California and New York to ensure that they sustained connectivity. (See Bobadilla Dep. at 141.)

---

[7]  At oral argument, counsel for MDRC indicated that Bobadilla was an "Information Associate-III," the highest grade of any Network Adminstrator, that he earned $70,000 plus a $5,000 hiring bonus during his first year of employment at MDRC, and that he ended his employment earning nearly $80,000. (See Tr. dated Aug. 12, 2005 at 9-10; see also Def.'s Rule 56.1 Stmt. ¶ 153.)

Moreover, the Position Description Questionnaire describes the plaintiff's primary

duties at MDRC as follows:

1.  Network Design/Integration/Management
    A. Install, configure and maintain the
       organization's data/voice network
       infrastructure.
    B. Implement and integrate LAN/WAN/Web presence
       to the entire corporation.
    C. Manage, support, design and integrate current
       and future network infrastructure for the
       entire organization.
    D. Design, manage and support services, their
       operating systems, utilities and
       applications.
    E. Insure reliable delivery of network services
       on and across servers and all devices
       attached to the organization[']s network
       infrastructure.
    F. Present solutions, which would enhance the
       performance, upgrade, replacement or
       combination of technologies, directed at
       MDRC's technical infrastructure.
    G. Configure LAN & WAN network infrastructure
       devices, understand their functionality and
       recognize potential problems.  Proactively
       resolve these problems when and where
       possible.

(Ex. 5 attached to Feliu Aff.)

It is plain that the Position Description Questionnaire includes

network analysis, design, configuration, and modification as

important parts of the Network Administrator position.  These

are the types of duties that characterize the computer employees

exempted under Section 213(a)(17).

The plaintiff argues that he did not perform all of the

duties described in the Position Questionnaire.  However, the

19

2002 Performance Review Form used to assess the plaintiff's job performance also rated the plaintiff in a number of highly technical areas that involved a combination of the computing skills set forth in Section 213(a)(17), including "Network Systems Integration, design, development, documentation and implementation; Network Administration in the Novell and NT environment; Firewall and Infrastructure Transition; Project Management; and Network Security." (Feliu Aff., Ex. 15.) For example, while the plaintiff now attempts to downplay his role, he was rated a "4" for work that was "superior, exceeding most expectations," for "Firewall and Infrastructure Transition" based on "Outstanding contributions, especially in the area of MDRC's switches and [Virtual Private Network ("VPN")]. Rolando also played a strong role in helping California to establish its connectivity." (Id.) Such evaluation forms are recognized as probative of the nature of an employee's duties. See Massaro v. New York Times, No. 87 Civ. 0957, 1998 WL 59637, at *4 (S.D.N.Y. June 6, 1988).

Moreover, on his current resume, the plaintiff describes a number of sophisticated duties and responsibilities that he performed at MDRC, which fall well within the primary duties of a computer employee specified in Section 213(a)(17); he described himself as a "senior engineer responsible for all

20

aspects of LAN/WAN optimization, and introduction of new services" at MDRC. (Ex. 4 attached to Feliu Aff.) In fact, the plaintiff takes credit for a number of exempt technical accomplishments on his resume, including his "[a]naly[sis of] existing network resources and determin[ation that] an underutilization existed. Implemented configurations, which provided a 400% network performance upgrade." (Id.) This accomplishment also appears to constitute the sort of "design, development, analysis, and modification of computer systems or programs" based on system design specifications described in Section 213(a)(17)(B).

The plaintiff contends that MDRC consultants discovered that this underutilization existed, and that these consultants provided the plaintiff with the configurations necessary to resolve the problem. (Pl.'s Rule 56.1 Stmt. ¶¶ 92, 97-98.) Although Cisco consultants assisted the plaintiff with configuration, Bobadilla acknowledges that he "decided to ask the questions and get the configuration for [the network]," and "I would say I was responsible for it." (Bobadilla Dep. at 124.) To solve the underutilization problem, the plaintiff analyzed the MDRC network and worked with people from Cisco to configure, or "team," four network integration cards, so that they could function as a unit to increase throughput. (Feliu

Aff. ¶ 42; Aff. of Angelica Manigbas ("Manigbas Aff.") sworn to Dec. 13, 2004, attached as Ex. B to Ho Aff., ¶ 17.)  According to MDRC, teaming the network cards requires knowledge and understanding of Cisco commands that must be inputted into the network switch by an attached console or linked desktop computer.  (Id.)

The plaintiff also engaged in the "design, documentation, testing, creation or modification of computer programs related to machine operating systems," which is exempted under Section 213(a)(17)(C).  For example, the plaintiff takes credit for resolving a problem with MDRC's VPN, which required the plaintiff to use trial and effort to mix and match various commands.  To solve this problem, the plaintiff had to browse or pass information through the network firewall and the task required "a thorough understanding of the physical devices involved, their operating systems, and the logical protocols demanded by each."  (Feliu Aff. ¶ 56.)  The plaintiff described this accomplishment on his current resume: "Resolved the Windows 2000/Cisco VPN browsing issue after the company had spent several thousand dollars in expenses for external consultants." (Ex. 4 attached to Feliu Aff.)

In this case, the plaintiff made actual, analytical decisions about how MDRC's computer network should function.

Bobadilla assisted in the design and implementation of the MDRC network in California.  In addition to installing and upgrading hardware and software, checking cables, and troubleshooting user connectivity problems, Bobadilla consistently made decisions regarding network modification and design, exempted responsibilities under Section 213(a)(17).  For example, the plaintiff redesigned and supplemented an enterprise-wide strategy to ensure that information housed in critical MDRC servers was backed-up properly.  The plaintiff took the primary role in locating new software, Backup Exec, and based on the plaintiff's research and recommendations, MDRC introduced a new backup system.  (Id. ¶¶ 133, 135.)  Other members of the Network Group were also in favor of moving to Backup Exec, but the strongest push to do so came from the plaintiff.  (Id. ¶ 134.) After discussion and consideration, MDRC purchased Backup Exec at a license fee of $12,000.  (Id. ¶ 136.)  The plaintiff began to test the software on one server and documented his test efforts in handwritten notes, which described the internal workings of Backup Exec and served as a users' guide for his colleagues.  (Id. ¶¶ 127-38, 140; see also Ex. 9 attached to Feliu Aff.)  After the initial testing was complete, the software was loaded onto eight servers and tested on each server to ensure that it was operational.  The plaintiff spearheaded

this effort.  (Id. ¶ 139.)  For approximately a year and a half after it was installed, the plaintiff was primarily responsible for maintaining and overseeing the integrity of the system and its associated hardware devices.  (Id. ¶ 141.)  The plaintiff also provided training to the rest of the Network Administrators on how to maintain the system that he had independently designed.  (Id. ¶ 142.)

The plaintiff's current resume also indicates that he was responsible for leading MDRC's Windows 2000 infrastructure migration project, which involved upgrading approximately 26 servers from the operating system of Windows NT 4.0 to Windows 2000.  Because a server is an operating system (see Def.'s Rule 56.1 Stmt. ¶ 9; Bobadilla Dep. at 106-07), the plaintiff appears to have been involved in further exempted "design, documentation, testing, creation, or modification of computer programs related to machine operating systems" pursuant to Section 213(a)(17)(C).  (Def.'s Rule 56.1 Stmt. ¶¶ 143-45.)

In view of all the evidence, Bobadilla performed highly-skilled work on MDRC computer systems and is an exempt computer employee under 29 U.S.C. § 213(a)(17).  Because the plaintiff is an exempt computer employee under Section 213(a)(17), it is unnecessary to reach the defendant's additional argument that

CONCLUSION

For the reasons explained above, the defendant's motion for summary judgment is **granted.** The Clerk is directed to enter judgment and close this case.

**SO ORDERED.**

**Dated: New York, New York**
**August ⨰3 , 2005**

John G. Koeltl
United States District Judge

---

213(a)(1), rather than the more recent computer employee exemption in Section 213(a)(17), which the parties agree is broader. In any event, the plaintiff in <u>Martin</u> appears to have performed duties closer to those of a Help Desk employee in this case rather than to Bobadilla's duties as a Network Administrator. Bobadilla was called on to perform exempted tasks that required a much higher degree of computer expertise than the plaintiff in <u>Martin</u> performed.

26